Christopher A. Seeger (CS – 4880)
David R. Buchanan (DB – 6363)
SEEGER WEISS LLP
One William Street, 10th Floor
New York, New York 10004
Telephone: (212) 584-0700
Facsimile: (212) 584-0799

E-filing

Attorneys for Plaintiff

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

(SAN FRANSISCO DIVISION)

| | |
|---|---|
| IN RE: BEXTRA AND CELEBREX MARKETING SALES PRACTICES AND PRODUCT LIABILITY LITIGATION | MDL No. 1699 |
| CATHY BYRD, | Case No. CV 08 0947 |
| Plaintiff, | |
| v. | **CIVIL COMPLAINT** |
| PFIZER, INC., PHARMACIA CORPORATION and G.D. SEARLE LLC, (FKA G.D. SEARLE & CO.), | **JURY TRIAL DEMANDED** |
| Defendants. | |

Plaintiff CATHY BYRD as and for a cause of action against the Defendant,

alleges, upon information and belief, as follows:

## INTRODUCTION

1.     This is an action for damages arising from the wrongful conduct of

Defendant Pfizer, Inc. ("Pfizer"), Pharmacia Corporation ("Pharmacia"), and G.D. Searle

LLC ("Searle") (collectively "Defendants") in designing, testing, manufacturing,

marketing, advertising and distributing its prescription drug Bextra.

1
COMPLAINT

1

**PARTIES**

2.      Plaintiff CATHY BYRD ("Plaintiff") is and at all times hereto a resident of Fayetteville, Arkansas.

3.      Plaintiff suffered a heart attack on or about February 1, 2005 after ingesting Bextra, a prescription drug used for the treatment of arthritis and acute pain.

4.      Defendant Pfizer is a Delaware corporation with its principal place of business at 235 East 42nd Street, New York, New York 10017. In 2003, Pfizer acquired Pharmacia Corporation for nearly $60 billion. At all relevant times Pfizer and/or its predecessors in interest were engaged in the business of designing, testing, manufacturing, packaging, marketing, distributing, promoting, and selling, either directly or indirectly, through third parties or related entities, the drug Valdecoxib, under the trade name Bextra in California, Arkansas and nationwide.

5.      Defendant G. D. Searle, LLC, formerly known as G.D. Searle & Co. ("Searle") is a Delaware corporation with its principal place of business in Illinois. At all relevant times, Searle has been engaged in the business of marketing and selling Bextra nationwide and in California and Arkansas. Searle is a subsidiary of Pfizer, acting as its agent and alter ego in all matters alleged within this Complaint.

6.      Defendant Pharmacia Corporation ("Pharmacia") is a Delaware corporation with its principal place of business in New Jersey. At all relevant times Pharmacia and/or its predecessors in interest were engaged in the business of designing, testing, manufacturing, packaging, marketing, distributing, promoting, and selling, either directly or indirectly, through third parties or related entities, Bextra in California, Arkansas and nationwide.

7.      At all times relevant to this action, Defendants intentionally, recklessly and/or

2
COMPLAINT

1  negligently concealed, suppressed, omitted, and misrepresented the risks, dangers, defects, and

2  disadvantages of Bextra, and advertised, promoted, marketed, sold, and distributed Bextra as a

3  safe prescription medication when, in fact, Defendants had reason to know, and did know, that

4

5  Bextra was not safe for its intended purposes, for the patients for whom it was prescribed, and

6  for whom it was sold; and that Bextra caused serious medical problems, and in certain patients,

7  catastrophic injuries and death.

8      8.     In engaging in the conduct alleged herein, each Defendant acted as the agent for

9  each of the other Defendants, or those Defendant's predecessors in interest.

10

11                            **JURISDICTION AND VENUE**

12     9.     This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C.A. §

13  1332 (diversity jurisdiction).  The amount in controversy exceeds $75,000.00 and there is

14  complete diversity of citizenship between Plaintiff and Defendants.

15

16     10.    Venue is proper in this District pursuant to 28 U.S.C. § 1391.  Defendants

17  marketed, advertised, and distributed the dangerous product in this district, thereby receiving

18  substantial financial benefit and profits from sales of the dangerous product in this district, and

19  reside in this district under 28 U.S.C. § 1391(c), such that venue is proper.

20     11.    At all relevant times herein, Defendants were in the business of designing,

21

22  manufacturing, marketing, developing, testing, labeling, promoting, distributing, warranting, and

23  selling their product, Bextra.  Defendants at all times relevant hereto designed, developed,

24  manufactured, promoted, marketed, distributed, tested, warranted, and sold in interstate

25  commerce (including Arkansas and California) the aforementioned prescription drug.

26  Defendants do substantial business in the States of Arkansas and California and within this

27

28  District, advertise in this district, receive substantial compensation and profits from sales of

                                      3
                                 COMPLAINT

1  Bextra in this District, and made material omissions and misrepresentations and breaches of

2  warranties in this District so as to subject them to *in personam* jurisdiction in this District.  In

3
4  engaging in the conduct alleged herein, each Defendant acted as the agent for each of the other

5  Defendants or those Defendant's predecessors in interest.

6  ## INTERDISTRICT ASSIGNMENT

7  12.    Assignment to the Northern District of California, San Francisco Division, is proper

8  pursuant to MDL-1699, Pretrial Order No. 2 dated December 13, 2005, as this action is related to

9
10  *In Re: Bextra and CELEBREX Marketing Sales Prac. And Pro. Liab. Lit.,* MDL-1699, assigned

11  to the Honorable Charles R. Breyer by the Judicial Panel on Multidistrict Litigation on

12  September 6, 2005.

13  ## FACTUAL BACKGROUND

14

15  **A.    Facts Regarding Bextra and Bextra's Market Launch**

16  13.    Bextra is one of a class of pain medications called non-steroidal anti-inflammatory

17  drugs ("NSAIDs"). Aspirin, naproxen (trade name Aleve), and ibuprofen (trade name Advil) are

18  examples of well-known NSAIDs.  NSAIDs reduce pain by blocking the body's production of

19  pain transmission enzymes called cyclo-oxygenase or "COX." There are two forms of COX

20  enzymes- COX-1 and COX-2. Aspirin, naproxen and ibuprofen all act by blocking COX-I and

21  COX-2 enzymes.

22  14.    In addition to decreasing inflammation, the prostaglandins that are supported by

23  COX- 1 enzymes are involved in the production of gastric mucus; this protects the stomach wall

24  from the hydrochloric acid present in the stomach. It is generally accepted in the medical

25  community that by blocking the COX-I enzyme, the body's ability to protect gastric tissue is

26  hampered and as a result, can cause harmful gastrointestinal side effects, including stomach

27  ulceration and bleeding.

28  15.    Prostaglandin 12 is the predominant cyclo-oxygenase product in endothelium,

1  inhibiting platelet aggregation (preventing clot formation), causing vasodilation, and preventing
2  the proliferation of vascular smooth muscle. Whereas older NSAIDS inhibit Thromboxane A2
3  and Prostaglandin 12, the COX-2 inhibitors leave Thromboxane A2 unaffected. Thromboxane
4  A2 is a potent platelet aggregator and vasoconstrictor, which is synthesized by platelets.
5  Therefore, while the older NSAIDs suppress platelet aggregation and vasoconstriction, the COX-
6  2 inhibitors support it.

7       16.    Defendants and other pharmaceutical companies set out to remedy these
8  gastrointestinal side effects suffered by some NSAID users by developing "selective" inhibitors,
9  called coxibs, which targeted only COX-2 production, thus (allegedly) allowing for proper
10  maintenance of gastric tissue while still reducing inflammation. Their development was based on
11  the hypothesis that COX-2 was the source of prostaglandins E2 and 12, which mediate
12  inflammation, and that COX-1 was the source of the same prostaglandins in the stomach lining.
13  By not inhibiting COX-l, whose products provide cytoprotection in the gastric 'epithelium, these
14  coxibs were thought to decrease the incidence of gastric side effects when compared to
15  traditional NSAIDs that inhibit both COX-l and COX-2.

16       17.    Traditional NSAIDs like aspirin reduce pain/inflammation and therefore pain by
17  inhibiting both COX-l and COX-2 enzymes simultaneously. As would be expected, traditional
18  NSAIDs may cause ulcers in the stomach. However, traditional NSAIDs do not cause blood
19
20  clots; rather they actually reduce the risk of clots and help protect heart function.

21       18.    Defendants and other pharmaceutical companies set out to remedy these ulcer and
22  bleeding problems suffered by some NSAID users by developing "selective" inhibitors that
23  would block only COX-2 production, thus (supposedly) allowing the proper maintenance of
24  gastric tissue while still reducing inflammation.

25       19.    In making this decision, Defendants and their predecessors in interest either
26  intentionally ignored or recklessly disregarded current medical knowledge that selective COX-2
27  inhibition lowers prostacyclin levels and causes thromboxane $A_2$ to be uninhibited, causing blood
28  clots, and giving rise to various clot-related cardiovascular events, including heart attack, stroke,

1    unstable angina. The vasoconstriction and fluid retention cause the hypertension.

2        20.    Pfizer launched Celebrex, the first of the three major COX-2 inhibitor drugs, in

3    early 1999 and initiated a massive marketing campaign to convince doctors and consumers of the

4    superiority of their new "blockbuster" drug over less inexpensive NSAIDs. In May 1999, Merck

5    & Co., Inc. ("Merck") launched Vioxx, its own selective COX-2 inhibitor.

6        21.    Seeking increased market share in this extremely lucrative market, Defendants, and

7    their predecessors in interest, also sought approval of a "second generation" selective COX-2

8    inhibitor and filed for FDA approval of Bextra on January 16, 2001 for the (i) prevention and

9    treatment of acute pain, (ii) treatment of primary dysmenorrhea, and (iii) relief of the signs and

10   symptoms of osteoarthritis and adult rheumatoid arthritis.

11       22.    The FDA granted approval of the new drug on November 16, 2001, for two

12   particular uses: (i) treatment of primary dysmenorrhea and (ii) relief for the signs and symptoms

13   of osteoarthritis and rheumatoid arthritis.

14       23.    The FDA did not grant approval to market and promote Bextra for the management

15   or prevention of acute pain.

16       24.    The FDA did not grant approval to promote Bextra as more effective than other

17   NSAIDs in preventing clinically serious gastrointestinal events such as perforations, ulcers or

18   gastric bleeding.

19       25.    Even without a label that allowed Defendants to legitimately claim superior safety,

20   when Defendants, and their predecessors-in-interest, began marketing Bextra in early 2002,

21   Defendants and their representatives and agents misrepresented the safety profile of Bextra to

22   consumers, including Plaintiff, the medical community, healthcare providers, and third party

23   payers. Defendants proceeded to promote, market, sell, and distribute Bextra as a much safer

24   and more effective pain reliever than other NSAIDs, such as aspirin, naproxen, and ibuprofen.

25   **B.    Facts Regarding Bextra's Safety and Defendants' Knowledge Thereof.**

26       26.    The potential for cardiovascular risk of selective COX-2 inhibitors was known to

27   Defendants long before the FDA granted market approval in November 2, 2001. By 1997, and

28   prior to the submission of the New Drug Application (the "NDA") for Bextra, Defendants were

1   aware that, by inhibiting COX-2, Bextra altered the homeostatic balance between prostacyclin

2   synthesis and thromboxane and thereby, increased the prothrombotic effects of the drugs,

3   causing blood clots to form in those who ingested it. *See* Topol, E.J., *et al., Risk of*

4   *Cardiovascular Events Associated with Selective Cax-2 Inhibitors, JAMA,* August 22, 2001 at

5   954. Although all COX-2 inhibitors have this mechanism of action, Bextra was the most

6   selective COX-2 inhibitor proposed for approval. Accordingly, it had the greatest potential to

7   cause adverse cardiovascular and cerebrovascular events.

8       27.    As Pharmacologist, Dr. Garrett Fitzgerald, of the University of Pennsylvania,

9   reported in an editorial published in *The New England Journal of Medicine* on October 21, 2004,

10   that it was known as early as 1999 that selective COX-2 inhibitors, such as Bextra, suppressed

11   the formation of prostaglandin I-2 in healthy volunteers, inhibited platelet aggregation in vitro,

12   and may predispose patients to myocardial infarction or thrombotic stroke.

13      28.    Nevertheless, on January 16, 2001, Defendants submitted an NDA to the FDA for

14   Bextra, omitting information about the extent of the risks associated with Bextra. Without a

15   complete picture of the potential hazards associated with the drug, the FDA approved Bextra on

16   or about November 16, 2001.

17      29.    Based on the studies performed on Celebrex, Vioxx, Bextra, and other COX-2

18   inhibitors, and basic research on this type of selective inhibitor which had been widely

19   conducted, Defendants knew when Bextra was being developed and tested that selective COX-2

20   inhibitors posed serious cardiovascular risks for anyone who took them, and presented a specific

21   additional threat to anyone with existing heart disease or cardiovascular risk factors. Studies

22   show that selective COX-2 inhibitors, including Bextra, decrease blood levels of a prostacyclin.

23   When those levels fall, the arteries are more vulnerable to clotting, high blood pressure, heart

24   attack, and stroke.

25      30.    On December 9, 2004, the FDA issued new information on side effects associated

26   with the use of Bextra and required the addition of certain warnings to, and the strengthening of

27   other warnings on, the Bextra label. The enhanced warnings followed in the wake of the results

28   of additional cardiovascular studies performed by Defendants, as well as numerous complaints to

1   the FDA regarding severe skin reactions.

2       31.     Yet, well prior to this warning, Defendants had knowledge of the coronary and
3   cardiovascular safety risks of Bextra from several studies. *See e.g.,* Otto, E.O., *Efficacy and*
4   *Safety of the Cyclooxygenase 2 Inhibitors Parecoxib and Valdecoxib in Patients Undergoing*
5   *Coronary Artery Bypass Surgery, The Journal of Thoracic and Cardiovascular Surgery,* June
6   2003 at 1481.

7       32.     Even Defendants' own (and Pfizer funded) post- drug approval meta-analysis study
8   (first presented on March 31, 2003 and again on May 15, 2003) included this data showing an
9   increased cardiovascular risk in patients treated with Bextra after undergoing coronary artery
10  bypass graft surgery.  Observed events included heart attack, stroke, and blood clots in the legs
11  and lungs.  The results were particularly relevant and striking as each of the study participants
12  who were a post-bypass surgery patient was taking anti-clotting agents at the time their exposure
13  to Bextra was being tracked.

14      33.     In mid-January 2005, a peer-reviewed paper from the University of Pennsylvania
15  found that in patients having heart bypass surgery, those who took Bextra in the intravenous
16  form, parecoxib, as opposed to a placebo, were three times more likely to have a heart attack or
17  stroke.

18      34.     From February 16-18, 2005, the FDA's Drug Safety and Risk Management
19  Advisory Committee and the Arthritis Drug Advisory Committee met jointly to further examine
20  the safety of COX-2 inhibitors.  There, FDA Office of Drug Safety Officer David Graham
21  testified that selective COX-2 inhibitors increase the risk for adverse cardiovascular events at
22  about the same rate as cigarette smoking, hypertension, and diabetes.

23      35.     Despite years of studies on selective COX-2 inhibitors, as well as the disturbing
24  new studies specifically analyzing the risks of Bextra, Defendants failed to take any action to
25  protect the health and welfare of patients, but instead, continued to promote the drug for sale
26  even after the FDA's Drug Safety and Risk Management Advisory Committee and Arthritis
27  Drug Advisory Committee meetings.

28      36.     On April 7, 2005, the FDA finally insisted that Defendants "voluntarily withdraw"

8
COMPLAINT

1  Bextra from the U.S. market, stating:

> ...the Agency has concluded that the overall risk versus benefit profile of Bextra is unfavorable. This conclusion is based on the potential increased risk for serious cardiovascular (CV) adverse events, which appears to be a class effect of non-steroidal anti-inflammatory drugs (NSAIDs) (excluding aspirin), an increased risk of serious skin reactions (e.g. toxic epidermal necrolysis, Stevens-Johnson syndrome, erythema multiforme) compared to other NSAIDs, and the fact that Bextra has not been shown to offer any unique advantage over the other available NSA1Ds.

FDA Alert for Healthcare Professionals, April 7, 2005.

37.     Continuing, the FDA noted:

> Bextra has been demonstrated to he associated with an increased risk of serious adverse CV events in two short-term trials in patients immediately post-operative from coronary artery bypass graft (CABG) surgery.... FDA has concluded that it is reasonable to extrapolate the adverse CV risk information for Bextra from the short-term CABU trials to chronic use given the fact that other COX-2 selective NSAIDs have been shown in long-term controlled clinical trials to be associated with an increased risk of serious adverse CV events (e.g., death, Ml, stroke), and the well described risk of serious, and often life-threatening gastrointestinal bleeding.... To date, there have been no studies that demonstrate an advantage of Bextra over other NSAIDs that might offset the concern about the [] serous skin risks, such as studies that show a GI safety benefit, better efficacy compared to other products, or efficacy in a setting of patients who are refractory to treatment with other products.

38.     The scientific data available during and after Bextra's approval process made clear to Defendants that their formulation of Bextra would cause a higher risk of blood clots, stroke and/or myocardial infarctions among Bextra consumers, alerting them to the need to do additional and adequate safety studies.

39.     As stated by Dr. Topol on October 21, 2004, in *The New England Journal of Medicine,* outlining Defendants' failure to have conducted the necessary trials before marketing to humans "... it is mandatory to conduct a trial specifically assessing cardiovascular risk and benefit of (COX-2 inhibitors). Such a trial needed to be conducted in patients with established coronary artery disease, who frequently have coexisting osteoarthritis requiring medication and

9

1    have the highest risk of further cardiovascular events."

2    40.    Dr. Topol was also the author on the study published in August 2001 in JAMA
3    (listed above) that reported an increased risk of thrombotic cardiovascular events in persons who
4    used COX-2 inhibitors.

5    41.    Based upon readily available scientific data, Defendants knew, or should have
6    known, that their pre-approval testing of Bextra did not adequately represent the cross-section of
7    individuals who were intended consumers and therefore, likely to take Bextra. Therefore,
8    Defendants' testing and studies were grossly inadequate. *See, e.g.,* PDR entry for Bextra (noting
9    that: "**Platelets**: In four clinical studies with young and elderly (>/=65 years) subjects, single and
10   multiple doses up to 7 day mg BID had no effect on platelet aggregation").

11   42.    Had Defendants done adequate testing prior to approval and "market launch," rather
12   than the extremely short duration studies done on the small size patient base that was actually
13   done Pharmacia and Searle's scientific data would have revealed significant increases in
14   incidence of strokes and myocardial infarctions among the intended and targeted population of
15   Bextra consumers. Adequate testing would have shown that Bextra possessed serious side
16   effects for individuals such as Plaintiff. Defendants should have taken appropriate measures to
17   ensure that their defectively designed product would not be placed in the stream of commerce
18   and/or should have provided full and proper warnings accurately and fully reflecting the scope
19   and severity of symptoms of those side effects should have been made.

20   43.    In fact, post-market approval data did reveal increased risks of clotting, stroke and
21   myocardial infarction, but this information was intentionally suppressed by Defendants in order
22   for them to gain significant profits from continued Bextra sales.

23   44.    Defendants' failure to conduct adequate testing and/or additional testing prior to
24   "market launch" was based upon their desire to generate maximum financial gains for
25   themselves and to gain a significant market share in the lucrative multi-billion dollar COX-2
26   inhibitor market.

27   45.    At the time Defendants manufactured, advertised, and distributed Bextra to
28   consumers, Defendants intentionally or recklessly ignored and/or withheld information regarding

10

the increased risks of hypertension, stroke and/or myocardial infarctions because Defendants knew that if such increased risks were disclosed, consumers such as Plaintiff would not purchase Bextra, but instead would purchase other cheaper and safer NSAIDs.

## C.    Facts Regarding Defendants' Marketing and Sale of Bextra

46.    At all times relevant herein, Defendants engaged in a marketing campaign with the intent that consumers would perceive Bextra as a safer and better drug than its other NSA1Ds and, therefore, purchase Bextra.

47.    Defendants widely and successfully marketed Bextra throughout the United States by, among other things, conducting promotional campaigns that misrepresented the efficacy of Bextra in order to induce a widespread use and consumption. Bextra was represented to aid the pain and discomfort of arthritis, osteoarthritis, and related problems. Defendants made misrepresentations by means of media advertisements, and statements contained in sales literature provided to Plaintiff' prescribing physicians.

48.    Despite knowledge of the dangers presented by Bextra, Defendants and Defendants' predecessors in interest, through their officers, directors and managing agents for the purpose of increasing sales and enhancing its profits, knowingly and deliberately failed to remedy the known defects of Defendants' product, Bextra, and failed to warn the public, including Plaintiff, of the serious risk of injury occasioned by the defects inherent in Defendants' product, Bextra. Defendants and their officers, agents and managers intentionally proceeded with the inadequate safety testing, and then the manufacturing, sale and marketing of Defendants' product, Bextra, knowing that persons would be exposed to serious potential danger, in order to advance their own pecuniary interests. Defendants' conduct was wanton and willful, and displayed a conscious disregard for the safety of the public and particularly of Plaintiff.

49.    In an elaborate and sophisticated manner, Defendants aggressively marketed Bextra directly to consumers and medical professionals (including physicians and leading medical scholars) in order to leverage pressure on third party payers, medical care organizations, and large institutional buyers (e.g., hospitals) to include Bextra on their formularies.  Faced with the

1  increased demand for the drug by consumers and health care professionals that resulted from

2  Defendants' successful advertising and marketing blitz, third party payers were compelled to add

3  Bextra to their formularies. Defendants' marketing campaign specifically targeted third party

4  payers, physicians, and consumers, and was designed to convince them of both the therapeutic

5  and economic value of Bextra.

6      50.    Defendants represented that Bextra was similar to ibuprofen and naproxen but was

7  superior because it lacked any of the common gastrointestinal adverse side effects associated

8  with these and other NSAIDs. For instance, NSAIDs can, in certain patients, cause

9  gastrointestinal perforations, ulcers and bleeding with long-term use. Defendants promoted

10 Bextra as a safe and effective alternative that would not have the same deleterious and painful

11 impact on the gut, but that would be just as effective, if not more so, for pain relief

12     51.    Bextra possessed dangerous and concealed or undisclosed side effects, including the

13 increased risk of serious cardiovascular events, such as heart attacks, unstable angina, cardiac

14 clotting, deep vein thrombosis, hypertension, and cerebrovascular events, such as strokes. In

15 addition, Bextra was no more effective than traditional and less expensive NSAIDs and, just like

16 traditional NSAIDs, carried a risk of perforations, ulcers, and gastrointestinal bleeding.

17 Defendants chose not to warn about these risks and dangers.

18     52.    Defendants knew of these risks before the U.S. Food and Drug Administration (the

19 "FDA") approved Bextra for sale on November 16, 2001, but Defendants ignored, downplayed,

20 suppressed, omitted, and concealed these serious safety risks and denied inefficacy in its

21 promotion, advertising, marketing, and sale of Bextra. Defendants' omission, suppression, and

22 concealment of this important information enabled Bextra to be sold to, and purchased, or paid

23 for by, the Consumers at a grossly inflated price.

24     53.    Consequently, Bextra captured a large market share of anti-inflammatory drugs

25 prescribed for and used by patients. In 2002 alone (after a drug launch in March of 2002), sales

26 of Bextra exceeded $1.5 billion, despite the significantly higher cost of Bextra as compared to

27 other pain relievers in the same family of drugs.

28     54.    It was not until April 7, 2005, that Defendants finally acknowledged Bextra's

deleterious side effects and announced that they were withdrawing the drug from the worldwide market based on what it misleadingly termed "new" and "unexpected" evidence linking Bextra to an increased risk of heart attacks and strokes.

55.    Had Defendants done adequate testing prior to approval and "market launch," Pharmacia's scientific data would have revealed significant increases in stoke and myocardial infarction amongst the intended population of Bextra consumers. Adequate testing would have shown that Bextra possessed serious side effects. Defendants should have taken appropriate measures to ensure that their defectively designed product would not be placed in the stream of commerce and/or should have provided full and proper warnings accurately and fully reflecting the scope and severity of symptoms of those side effects should have been made public.

56.    In fact, post-market approval data did reveal increased risks of clotting, stroke and myocardial infarction, but this information was intentionally suppressed by Defendants in order for them to gain significant profits from continued Bextra sales.

57.    Defendants' failure to conduct adequate testing and/or additional testing prior to "market launch" was based upon their desire to generate maximum financial gains for themselves and to gain a significant market share in the lucrative multi-billion dollar COX-2 inhibitor market.

58.    At the time Defendants manufactured, advertised, and distributed Bextra to consumers, Defendants intentionally or recklessly ignored and/or withheld information regarding the increased risks of hypertension, stroke and/or myocardial infarctions because Defendants knew that if such increased risks were disclosed, consumers such as Plaintiff would not purchase Bextra, but instead would purchase other cheaper and safer NSAID drugs.

59.    At all times relevant herein, Defendants engaged in a marketing campaign with the intent that consumers, including Plaintiff, and their doctors would perceive Bextra as a better drug than its competitors and, therefore, purchase Bextra.

60.    Defendants widely and successfully marketed BEXTRA throughout the United States by, among other things, conducting promotional campaigns that misrepresented the efficacy of BEXTRA in order to induce a widespread use and consumption. BEXTRA was

13
COMPLAINT

1 represented to aid the pain and discomfort of arthritis, osteoarthritis, and related problems.

2 Defendants made misrepresentations by means of media advertisements, and statements

3 contained in sales literature provided to Plaintiff' prescribing physicians.

4      61.     Prior to manufacturing, sale and distribution of BEXTRA, Defendants, through

5 their officers, director and managing agents, had notice and knowledge from several sources, that

6 BEXTRA presented substantial and unreasonable risks of harm to the consumer. As such,

7 BEXTRA consumers, including Plaintiff, were unreasonably subject to risk of injury or death

8 from the consumption of Defendants' product, BEXTRA.

9      62.     Despite such knowledge, Defendants and Defendants' predecessors in interest,

10 through their officers, directors and managing agents for the purpose of increasing sales and

11 enhancing its profits, knowingly and deliberately failed to remedy the known defects of

12 Defendants' product, BEXTRA, and failed to warn the public, including Plaintiff, of the serious

13 risk of injury occasioned by the defects inherent in Defendants' product, BEXTRA. Defendants

14 and their officers, agents and managers intentionally proceeded with the inadequate testing, and

15 then the manufacturing, sale and marketing of Defendants' product, BEXTRA, knowing that

16 persons would be exposed to serious potential danger, in order to advance their own pecuniary

17 interests. Defendants' conduct was wanton and willful, and displayed a conscious disregard for

18 the safety of the public and particularly of Plaintiff.

19 **D.**     **Plaintiff's Use of Bextra**

20      63.     Plaintiff CATHY BYRD was prescribed and began taking Bextra in approximately

21 July 2004.

22

23      64.     On or about February 1, 2005, Plaintiff CATHY BYRD suffered a heart attack

24 while on the prescription drug Bextra.

25      65.     Plaintiff used Bextra as prescribed and in a foreseeable manner.

26      66.     As a direct and proximate result of ingesting Bextra, Plaintiff suffered a stroke.

27      67.     As a direct and proximate result of ingesting Bextra, Plaintiff has experienced

28

1  severe pain and suffering, and has sustained permanent injuries and emotional distress.

2  68.    Plaintiff used Bextra that had reached him without substantial change in its

3
4  condition since it was manufactured or sold.

5  69.    Plaintiff would not have used Bextra if Defendant had properly disclosed the risks

6  associated with the product.

7  70.    By reason of the foregoing, Plaintiff has been severely and permanently injured and

8
9  will require constant and continuous medical care and treatment.

10  **FIRST CLAIM FOR RELIEF**

11  **NEGLIGENCE**

12  71.    The foregoing paragraphs of this Complaint are realleged and incorporated by

13  reference.

14
15  72.    Defendants had a duty to exercise reasonable care in the warning about, design,

16  testing, labeling, manufacturing, marketing, sale, and/or distribution of Bextra, including a duty

17  to ensure that Bextra did not cause users to suffer from unreasonable, unknown, and/or

18  dangerous side effects.

19  73.    Defendants failed to exercise reasonable care in the warning about, designing,

20
21  testing, labeling, manufacture, marketing, sale, and/or distribution of Bextra, in that Defendants

22  knew or should have known that taking Bextra caused unreasonable and dangerous injuries,

23  including stroke, heart attack, and death.

24  74.    Defendants breached their duty and was negligent in their actions, representations,

25
26  and omissions toward Plaintiff, in part, by having:

27  (a)    Failed to exercise due care in the development and preparation of Bextra

28  so as to avoid the aforementioned risks to individuals using these products;

1

(b)     Failed to exercise due care in the design of Bextra so as to avoid the

2

aforementioned risks to individuals using these products;

3

4

(c)     Failed to exercise due care in the manufacture and inspection of Bextra so as

5

to avoid the aforementioned risks to individuals using these products;

6

(d)     Failed to exercise due care in the promotion of Bextra so as to avoid the

7

aforementioned risks to individuals using these products;

8

9

(e)     Failed to exercise due care in the sale and marketing of Bextra so as to avoid

10

the aforementioned risks to individuals using these products;

11

(f)     Failed to include adequate warnings with Bextra that would alert Plaintiff

12

and other consumers, and theft prescribing physicians to its potential risks and serious side

13

effects;

14

15

(g)     Failed to adequately and properly test Bextra before placing it on the market;

16

(h)     Failed to conduct sufficient testing on Bextra, which if properly performed,

17

would have shown that Bextra had serious cardiovascular side effects, including, but not limited

18

to, stroke, heart attack, and death;

19

20

(i)     Failed to adequately warn Plaintiff and his physician that use of Bextra

21

carried a risk of disability and death due to stroke and other serious side effects;

22

(j)     Failed to completely, accurately and in a timely fashion, disclose the results

23

24

of the pre-marketing testing and post-marketing surveillance and testing to Plaintiff, consumers,

25

the medical community, and the FDA.

26

(k)     Failed to provide adequate post-marketing warnings or instructions after.

27

Defendant knew, or should have known, of the significant risks of cardiovascular injury from the

28

16
COMPLAINT

1   use of Bextra;

2           (l)     Failed to provide adequate and accurate training and information to the sales

3   representatives who sold Bextra;

4

5           (m)     Failed to provide adequate and accurate training and information to the

6   healthcare providers for the appropriate use of Bextra;

7           (n)     Placed an unsafe product into the stream of commerce;

8

9           (o)     Was otherwise careless or negligent; or

10          (p)     Was otherwise grossly negligent

11      75.     Defendants knew, or should have known, that Bextra caused unreasonably

12  dangerous risks and serious side effects of which Plaintiff and his physician would not be aware.

13      76.     Defendants knew or should have known that consumers such as Plaintiff would

14

15  suffer injury as a result of Defendants' failure to exercise reasonable care as described above.

16      77.     Defendants knew or should have known of the defective nature of Bextra, as set

17  forth herein, but continued to design, manufacture, market, and sell Bextra so as to maximize

18  sales and profits at the expense of the health and safety of the public, including Plaintiff, in

19  conscious and/or negligent disregard of the foreseeable harm caused by Bextra.

20

21      78.     Defendants' conduct was committed with knowing, conscious, wanton, willful, and

22  deliberate disregard for the value of human life and the rights and safety of consumers, including

23  Plaintiff, thereby entitling Plaintiff to punitive and exemplary damages so as to punish

24  Defendants and deter them from similar conduct in the future.

25

26      79.     Defendants failed to disclose to the healthcare community, Plaintiff, and the general

27  public facts known or available to them, as alleged herein, in order to ensure continued and

28

increased sales of Bextra. This failure to disclose deprived Plaintiff and his doctors of the information necessary for him to weigh the true risks of taking Bextra against the benefits.

80.    Defendants knew or should have known that consumers such as Plaintiff would foreseeably suffer injuries as a result of their failure to exercise ordinary care.

81.    As a direct and proximate result of Defendant's negligence as described herein, Plaintiff has sustained harm, including permanent and debilitating injuries. These injuries have caused, and will continue to cause, extensive pain and suffering and severe emotional distress, and have substantially reduced Plaintiff's ability to enjoy life; and have caused, and will continue to cause, Plaintiff to expend substantial sums of money for medical, hospital, and related care, all to Plaintiff's general damage.

82.    As a direct and proximate result of Defendants' negligence as described herein, Plaintiff has incurred expenses for reasonable and necessary health care treatment and services. Plaintiff will be required to obtain future medical and/or hospital care, attention, and services in an amount as yet unascertained.

83.    WHEREFORE, Plaintiff demands judgment against Defendants and seek compensatory damages, and exemplary and punitive damages together with interest, the costs of suit and attorneys' fees and such other and further relief as this Court deems just and proper.

## SECOND CLAIM FOR RELIEF

## STRICT PRODUCT LIABILITY - FAILURE TO WARN

84.    The foregoing paragraphs of this Complaint are realleged and incorporated by reference.

85.    Defendants manufactured, marketed, distributed, and supplied Bextra. As such, they had a duty to warn the public, and Plaintiff, of the health risks associated with using Bextra.

86.     Bextra was under the exclusive control of Defendants, and was sold without adequate warnings regarding the risk of stroke, heart attack, and death associated with its use.

87.     As a direct and proximate result of the defective condition of Bextra, as manufactured and/or supplied by Defendants, and as a direct and proximate result of negligence, gross negligence, willful and wanton misconduct, or other wrongdoing and actions of Defendants described herein, Plaintiff has suffered, and will continue to suffer injury, harm, and economic loss as previously alleged.

88.     Defendants knew of the defective nature of Bextra but continued to design, manufacture, market, and sell them so as to maximize sales and profits at the expense of the public health and safety, in knowing, conscious, and deliberate disregard of the foreseeable harm caused by Bextra and in violation of their duty to provide an accurate, adequate, and complete warning concerning the use of Bextra.

89.     Defendants' conduct in the packaging, warning, marketing, advertising, promotion, distribution, and sale of Bextra, was committed with knowing, conscious, and deliberate disregard for the rights and safety of consumers such as Plaintiff, thereby entitling Plaintiff to punitive damages in an amount to be determined at trial that is appropriate to punish Defendants and deter them from similar conduct in the future.

90.     WHEREFORE, Plaintiff demands judgment against Defendants and seek compensatory damages, and exemplary and punitive damages together with interest, the costs of suit and attorneys' fees and such other and further relief as this Court deems just and proper.

## THIRD CLAIM FOR RELIEF

## STRICT PRODUCT LIABILITY - DEFECTIVE
## IN DESIGN OR MANUFACTURE

91.    The foregoing paragraphs of this Complaint are realleged and incorporated by reference.

92.    Defendants are the manufacturer, seller, distributor, marketer, and/or supplier of Bextra, which is defective and unreasonably dangerous to consumers.

93.    Bextra was sold, distributed, supplied, manufactured, marketed, and/or promoted by Defendants, and was expected to reach and did reach consumers without substantial change in the condition in which it were manufactured and sold by Defendants.

94.    Bextra was defective in its design and unreasonably dangerous in that its foreseeable risks exceeded the benefits associated with its design or formulation.

95.    Alternatively, Bextra was defective in design or formulation in that its use posed a greater likelihood of injury than other alternative treatments for arthritis and was more dangerous than an ordinary consumer could reasonably foresee.

96.    Defendants actually knew of the defective nature of Bextra but continued to design, manufacture, market, and sell it so as to maximize sales and profits at the expense of the public health and safety, in conscious disregard of the foreseeable harm caused by Bextra.

97.    There were safer alternative methods and designs for the treatment of pain.

98.    As a direct and proximate result of the design and manufacturing defects of Bextra, Plaintiff suffered, and will continue to suffer, injury, harm, and economic loss as previously alleged herein.

99.    Defendants' aforementioned conduct was committed with knowing, conscious, and

1    deliberate disregard for the rights and safety of consumers such as Plaintiff, thereby entitling

2    Plaintiff to punitive damages in an amount to be determined at trial that is appropriate to punish

3    Defendants and deter them from similar conduct in the future.

4

5    100.    WHEREFORE, Plaintiff demands judgment against Defendants and seek

6    compensatory damages, and exemplary and punitive damages together with interest, the costs of

7    suit and attorneys' fees and such other and further relief as this Court deems just and proper.

8                          **FOURTH CLAIM FOR RELIEF**

9                          **BREACH OF IMPLIED WARRANTY**

10

11    101.    The foregoing paragraphs of this Complaint are realleged and incorporated by

12    reference.

13    102.    Defendants manufactured, marketed, sold, and distributed Bextra specifically for

14    the treatment of osteoarthritis and other conditions causing acute pain.

15

16    103.    At the time Defendants marketed, sold, and distributed Bextra for use by Plaintiff,

17    Defendants knew of the purpose for which Bextra was intended and impliedly warranted Bextra

18    to be of merchantable quality and safe and fit for such use.

19    104.    Plaintiff reasonably relied on the skill, superior knowledge, and judgment of

20    Defendant as to whether Bextra was of merchantable quality and safe and fit for its intended use.

21

22    105.    Plaintiff purchased and used Bextra to treat his acute pain.

23    106.    Due to Defendant's wrongful conduct as alleged herein, Plaintiff could not have

24    known about the risks and side effects associated with Bextra until after Plaintiff ingested the

25    drug.

26

27    107.    Contrary to such implied warranty, Bextra was not of merchantable quality and was

28    not safe or fit for its intended use.

21
COMPLAINT

108.    As a direct and proximate result of Defendants' breach of implied warranty, Plaintiff has suffered, and will continue to suffer, injury, harm, and economic loss, as previously alleged herein.

109.    Defendants' aforementioned conduct was committed with knowing, conscious, and deliberate disregard for the rights and safety of consumers such as Plaintiff, thereby entitling Plaintiff to punitive damages in an amount to be determined at trial that is appropriate to punish Defendants and deter them from similar conduct in the future.

110.    WHEREFORE, Plaintiffs demand judgment against Defendants and seek compensatory damages, and exemplary and punitive damages together with interest, the costs of suit and attorneys' fees and such other and further relief as this Court deems just and proper.

## FIFTH CLAIM FOR RELIEF

## BREACH OF EXPRESS WARRANTY

111.    Plaintiff incorporates by reference all of the paragraphs of this Complaint as if fully set forth herein.

112.    Defendants expressly represented to and other consumers and the medical community that BEXTRA was safe and fit for its intended purposes, that it was of merchantable quality, that it did not produce any dangerous side effects, particularly any unwarned-of side effects, and that it was adequately tested.

113.    These warranties came in the form of:

(a)    Defendants' public written and verbal assurances of the safety and efficacy of BEXTRA;

(b)    Press release, interviews and dissemination via the media of promotional information, the sole purpose of which was to create an increased demand for BEXTRA, which

failed to warn of the risk of injuries inherent to the ingestion of BEXTRA, especially to the long-term ingestion of BEXTRA;

(c)    Verbal and written assurances made by Defendants regarding BEXTRA and downplaying the risk of injuries associated with the drug;

(d)    False and misleading written information, supplied by Defendants, and published in the Physician's Desk Reference on an annual basis, upon which physicians relied in prescribing BEXTRA during the period of Plaintiff's ingestion of BEXTRA, and;

(e)    Advertisements.

114.    The documents referred to above were created by and at the direction of Defendants.

115.    Defendants knew or had reason to know that BEXTRA did not conform to these express representations in the BEXTRA is neither as safe nor as effective as represented, and that BEXTRA produces serious adverse side effects.

116.    BEXTRA did not and does not conform to Defendants' express representations because it is not safe, has numerous and serious effects, including unwarned-of side effects, and causes severe and permanent injuries.

117.    Plaintiff, other consumers, and the medical community relied upon Defendants' express warranties.

118.    As a direct and proximate consequence of Defendants' acts, omissions, and misrepresentations described herein, the Plaintiff sustained serious cardiovascular injuries; has required and will require healthcare and services; has incurred and will continue to incur medical and related expenses; has suffered loss of wages and a diminished capacity to earn wages in the future; has suffered and will continue to suffer mental anguish, a diminished capacity for the

23
COMPLAINT

enjoyment of life, a diminished quality of life, increased risk of premature death, aggravation of preexisting conditions and activation of latent conditions and other such damages. Plaintiff's direct medical losses and costs include care for hospitalization, physician care, monitoring, treatment, medications, and supplies. Plaintiff will continue to incur such losses in the future.

119.    Defendants' conduct was committed with knowing, conscious, wanton, willful, and deliberate disregard for the value of human life and the rights and safety of consumers, including Plaintiff, thereby entitling Plaintiff to punitive and exemplary damages so as to punish Defendants and deter them from similar conduct in the future.

120.    WHEREFORE, Plaintiff demands judgment against Defendants and seek compensatory damages, and punitive and exemplary damages together with interest, the costs of suit and attorneys' fees and such other and further relief as this Court deems just and proper.

## SIXTH CLAIM FOR RELIEF

## COMMON LAW FRAUD

121.    Plaintiff incorporates by reference each and every allegation set forth above as if alleged in full herein.

122.    At all material times, Defendants were engaged in the business of distributing, promoting, and selling Bextra.

123.    Defendants made misrepresentations of material facts to, and omitted and/or concealed material facts from, Plaintiff and his physician in the advertising, marketing, distribution and sale of Bextra regarding its safety and use.

124.    Defendants deliberately and intentionally misrepresented to, and omitted and/or concealed material facts from, consumers, including Plaintiff and the healthcare community, that Bextra was safe when used as intended for the treatment of arthritis. Such misrepresentations,

omissions, and concealments of facts include, but are not limited to:

(a) Failing to disclose, and/or intentionally concealing, the results of tests showing the potential risks of hypertension, heart attack, stroke and other cardiovascular injuries associated with the use of Bextra;

(b) Failing to include adequate warnings with Bextra about the potential and actual risks and the nature, scope, severity, and duration of serious adverse effects of Bextra;

(c) Concealing and/or providing false or inaccurate information regarding the known risks of stroke, heart attack, and death associated with Bextra; and

(d) Concealing the known incidents of stroke, heart attack, and death, as previously alleged herein.

125.    Defendants intentionally concealed facts known to it, as alleged herein, in order to ensure increased sales of Bextra.

126.    Defendants had a duty to disclose the foregoing risks and failed to do so, despite possession of information concerning those risks. Defendants' representations that Bextra was safe for its intended purpose was false, as Bextra was, in fact, dangerous to the health of Plaintiff when used for the treatment of his acute pain, and there were alternative, effective, and safe treatments available to Plaintiff.  Moreover, Defendants knew that their statements were false, knew of incidents of serious injuries, such as stroke, heart attack, and death associated with the use of Bextra, and knew that their omissions rendered its statements false or misleading.

127.    In the alternative, Defendants failed to exercise reasonable care in ascertaining the accuracy of the information regarding the safe use of Bextra, and failed to disclose that Bextra caused stroke, heart attack, and death, among other serious adverse effects. Defendants also

1    failed to exercise reasonable care in communicating the information concerning Bextra to

2    Plaintiff and the healthcare community, and/or concealed facts that were known to Defendants.

3       128.    Plaintiff was not aware of the falsity of the foregoing representations, nor was

4

5    Plaintiff aware that material facts concerning the safety of Bextra had been concealed or omitted.

6    In reliance upon Defendants' misrepresentations (and the absence of disclosure of the serious

7    health risks), Plaintiff's physician prescribed, and Plaintiff purchased and ingested, Bextra. Had

8    Plaintiff or his prescribing physician known the true facts concerning the risks associated with

9
     Bextra, he would not have taken it.
10

11      129.    The reliance by Plaintiff and his physician upon Defendants' misrepresentations

12   was justified because said misrepresentations and omissions were made by individuals and

13   entities that were in a position to know the true facts concerning Bextra. Neither Plaintiff nor his

14   physician were in a position to know the true facts, because Defendants aggressively promoted

15
     the use of Bextra and concealed the risks associated with its use, thereby inducing Plaintiff to use
16

17   Bextra to treat his acute pain rather than alternative, safer treatments.

18      130.    As a direct and proximate result of Defendants' misrepresentations, and/or

19   concealment, Plaintiff has suffered, and will continue to suffer, injury, harm, and economic loss

20   as previously alleged herein.
21

22      131.    Defendants' conduct in concealing material facts and making the foregoing

23   misrepresentations, as alleged herein, was committed with conscious or reckless disregard of the

24   rights and safety of consumers such as Plaintiff, thereby entitling Plaintiff to punitive damages in

25   an amount to be determined at trial that is appropriate to punish Defendants and deter them from

26
     similar conduct in the future.
27

28

**SEVENTH CLAIM FOR RELIEF**

**FRAUDULENT MISREPRESENTATION & CONCEALMENT**

132.    Plaintiff incorporates by reference each and every allegation set forth above as if alleged in full herein.

133.    Defendants' superior knowledge and expertise, their relationship of trust and confidence with doctors and the public, their specific knowledge regarding the risks and dangers of Bextra, and their intentional dissemination of promotional marketing information about Bextra for the purpose of maximizing their sales, each gave rise to the affirmative duty to meaningfully disclose and provide all material information about Bextra's risks and harms to doctors and consumers.

134.    Defendants made fraudulent affirmative misrepresentations with respect to Bextra in the following particulars:

a.    Defendants represented through their labeling, advertising, marketing materials, detail persons, seminar presentations, publications, notice letters, and regulatory submissions that Bextra had been tested and found to be safe and effective for the treatment of pain and inflammation; and

b.    Defendants represented that Bextra was safer than other alternative medications.

135.    Defendants made affirmative misrepresentations; and fraudulently, intentionally and/or recklessly concealed material adverse information regarding the safety and effectiveness of Bextra.

136.    Defendants made these misrepresentations and actively concealed adverse information at a time when Defendants knew or had reason to know that Bextra had defects and

1    was unreasonably dangerous and was not what Defendants had represented to the medical

2    community, the FDA and the consuming public, including Plaintiff.

3    137.    Defendants omitted, suppressed and/or concealed material facts concerning the

4

5    dangers and risk of injuries associated with the use of Bextra including, but not limited to, the

6    cardiovascular, cerebrovascular, and other serious health risks. Furthermore, Defendants'

7    purpose was willfully blind to, ignored, downplayed, avoided, and/or otherwise understated the

8    serious nature of the risks associated with the use of Bextra in order to increase its sales.

9
      138.    The representations and concealment were undertaken by Defendants with an intent
10
11   that doctors and patients, including Plaintiff, rely upon them.

12   139.    Defendants' representations and concealments were undertaken with the intent of

13   defrauding and deceiving Plaintiff, other consumers, and the medical community to induce and

14   encourage the sale of Bextra.

15
      140.    Defendants' fraudulent representations evinced their callous, reckless, willful, and
16
17   depraved indifference to the health, safety, and welfare of consumers, including Plaintiff.

18   141.    Plaintiff's physicians and Plaintiff relied on and were induced by Defendants'

19   misrepresentations, omissions, and/or active concealment of the dangers of Bextra in selecting

20   Bextra treatment.

21
      142.    Plaintiff and the treating medical community did not know that the representations
22
23   were false and were justified in relying upon Defendants' representations.

24   143.    In the alternative, Defendants failed to exercise reasonable care in ascertaining the

25   accuracy of the information regarding the safe use of Bextra, and failed to disclose that Bextra

26   caused stroke, heart attack, and death, among other serious adverse effects. Defendants also

27

28

28
COMPLAINT

failed to exercise reasonable care in communicating the information concerning Bextra to

Plaintiff and the healthcare community, and/or concealed facts that were known to Defendant.

144.    Had Plaintiff been aware of the increased risk of side effects associated with Bextra

and the relative efficacy of Bextra compared with other readily available medications, Plaintiff

would not have taken Bextra as he did.

145.    As a direct and proximate result of Defendants' misrepresentations, and/or

concealment, Plaintiff has suffered, and will continue to suffer, injury, harm, and economic loss

as previously alleged herein.

146.    Defendants' conduct in concealing material facts and making the foregoing

misrepresentations, as alleged herein, was committed with knowing, conscious, wanton, willful,

reckless and deliberate disregard for the value of human life and the rights and safety of

consumers such as Plaintiff, thereby entitling Plaintiff to punitive and exemplary damages in an

amount to be determined at trial that is appropriate to punish Defendants and deter them from

similar conduct in the future.

147.    WHEREFORE, Plaintiff demands judgment against Defendants and seeks

compensatory damages, and punitive and exemplary damages together with interest, the costs of

suit and attorneys' fees, and such other and further relief as this Court deems just and proper.

## EIGHTH CLAIM FOR RELIEF

### UNJUST ENRICHMENT

148.    Plaintiff incorporates by reference each and every allegation set forth above as if

alleged in full herein.

1    149.    At all times relevant to this action, Defendants were the manufacturers, sellers,

2    and/or suppliers of Bextra.

3    150.    Plaintiff paid for Bextra for the purpose of managing her pain safely and

4
5    effectively.

6    151.    Defendants have accepted payment from Plaintiff for the purchase of Bextra.

7    152.    Plaintiff did not receive the safe and effective pharmaceutical product for which he

8    paid.

9    153.    It is inequitable and unjust for Defendants to retain this money because Plaintiff did

10
11   not in fact receive the product Defendants represented Bextra to be.

12   154.    WHEREFORE, Plaintiff demands judgment against Defendants and seeks equitable

13   relief, the costs of suit and attorneys' fees, and such other and further relief as this Court deems

14   just and proper.

15
                            **NINTH CLAIM FOR RELIEF**
16

17                    **VIOLATION OF NEW YORK G.B.L. § 349**

18   155.    Plaintiff incorporates by reference each and every allegation set forth above as if

19   alleged in full herein.

20   156.    Defendants' misrepresentations and concealment of material fact constitute

21
22   unconscionable commercial practices, deception, fraud, false pretenses, misrepresentation,

23   and/or the knowing concealment, suppression or omission of material facts with the intent that

24   others rely on such concealment, suppression, or omission in connection with the sale and

25   advertisement of Bextra.

26   157.    Defendants engaged in the deceptive acts and practices alleged herein in order to
27
28   sell a consumer product, Bextra, to the public, including Plaintiff.

1    158.    Defendants intentionally concealed facts known to them, as alleged herein, in order

2    to ensure the increased sales of Bextra.

3    159.    Defendants' conduct, as alleged herein, was likely to mislead a reasonable

4
5    consumer, such as Plaintiff, acting reasonably under the circumstances to believe that Bextra was

6    a safe treatment for his pain.

7    160.    Defendants' conduct, as alleged herein, substantially occurred in or emanated from

8    the State of New York.

9    161.    As a direct and proximate result of Defendants' actions, Plaintiff has been injured

10
11   as previously alleged herein.

12   162.    WHEREFORE, Plaintiff demands judgment against Defendants and seek

13   compensatory damages, and exemplary and punitive damages together with interest, the costs of

14   suit and attorneys' fees and such other and further relief as this Court deems just and proper.

15

16

17                                **PRAYER FOR RELIEF**

18   **WHEREFORE**, Plaintiff prays for relief as follows:

19   a.    General damages in excess of the jurisdictional amount of this Court;

20   b.    Consequential damages;

21
22   c.    Disgorgement of profits

23   d.    Restitution;

24   e.    Punitive and exemplary damages;

25   f.    Pre-judgment and post-judgment interest as provided by law;

26

27

28

                                      31
                                   COMPLAINT

1    g.    Recovery of Plaintiff's costs including, but not limited to, discretionary Court

2    costs of these causes, and those costs available under the law, as well as expert

3    fees and attorneys' fees and expenses, and costs of this action; and

4

5    h.    Such other and further relief as the Court deems just and proper.

6

7  Dated: February 13, 2008                      **SEEGER WEISS LLP**

8

9

10                              By: _____

                                    Christopher A. Seeger

11                                  David R. Buchanan

                                  One William Street

12                                  New York, New York 10004

                                  (212) 584-0700

13

14                                  **Attorneys for Plaintiff**

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## DEMAND FOR JURY TRIAL

Plaintiff demands a trial by jury on all claims so triable in this action.


Dated: February 13, 2008

SEEGER WEISS LLP

By:
      Christopher A. Seeger
      David R. Buchanan
      One William Street
      New York, New York 10004
      (212) 584-0700

**Attorneys for Plaintiff**

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

1

## VERIIFICATION

2  STATE OF NEW YORK     }

3                        } ss.:

4  COUNTY OF NEW YORK  }

5

6  I, the undersigned, an attorney admitted to practice in the Courts of New York State, state

7  under penalty of perjury that I am one of the attorneys for the plaintiff in the within action; I

8  have read the foregoing VERIFIED COMPLAINT and know the contents thereof; the same

9  is true to my own knowledge, except as to the matters I believe to be true. The reason this

10  verification is made by me and not by my client, is that my client is not presently in the

11  County where I maintain my offices. The grounds of my belief as to all matters not stated

12  upon my own knowledge are the materials in my file and the investigation conducted by my

13  office.

14

15

16  Dated: February 13, 2008

17        New York, New York

18

19

20

21



22                        CHRISTOPHER A. SEEGER

23

24

25

26

27

28

JS 44 - CAND (Rev. 11/04)

**CRB**

# CIVIL COVER SHEET

The JS-44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON PAGE TWO.)

## I.(a) PLAINTIFFS

CATHY BYRD,

E-filing

## DEFENDANTS

PFIZER, INC., PHARMACIA CORPORATION and G.D. SEARLE LLC, (FKA G.D. SEARLE & CO.),

ADR

**(b)** COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF _____
(EXCEPT IN U.S. PLAINTIFF CASES)

Fayetteville, Arkansas

COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT _____
(IN U.S. PLAINTIFF CASES ONLY)
NOTE:  IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE
TRACT OF LAND INVOLVED.
New York

**(c)** ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)

Seeger Weiss LLP, One William Street, New York, NY 10004

ATTORNEYS (IF KNOWN)

DLA Piper Rudnick Gray Cary US LLP

## II. BASIS OF JURISDICTION (PLACE AN 'X' IN ONE BOX ONLY)

☐ 1 U.S. Government
Plaintiff

☐ 3 Federal Question
(U.S. Government Not a Party)

☐ 2 U.S. Government
Defendant

☑ 4 Diversity
(Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (PLACE AN 'X' IN ONE BOX FOR PLAINTIFF
(For diversity cases only)                    AND ONE BOX FOR DEFENDANT)

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☑ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☑ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. ORIGIN (PLACE AN "X" IN ONE BOX ONLY)

☐ Original
Proceeding

☐ Removed from
State Court

☐ Remanded from
Appellate Court

☐ Reinstated or
Reopened

☐ Transfered from
Another district
(specify)

☑ Multidistrict
Litigation

☐ Appeal to District
Judge from Magistrate
Judgment

## V. NATURE OF SUIT (PLACE AN "X" IN ONE BOX ONLY)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 362 Personal Injury | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal 28 USC 157 | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product | Med Malpractice | ☐ 625 Drug Related Seizure of | | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | Liability | ☑ 365 Personal Injury | Property 21 USC 881 | | ☐ 450 Commerce/ICC Rates/etc. |
| ☐ 150 Recovery of Overpayment | ☐ 320 Assault Libel & | Product Liability | ☐ 630 Liquor Laws | **PROPERTY RIGHTS** | ☐ 460 Deportation |
| & Enforcement of | Slander | ☐ 368 Asbestos Personal | ☐ 640 RR & Truck | | ☐ 470 Racketeer Influenced and |
| Judgment | ☐ 330 Federal Employers | Injury Product Liability | ☐ 650 Airline Regs | ☐ 820 Copyrights | Corrupt Organizations |
| ☐ 151 Medicare Act | Liability | | ☐ 660 Occupational | ☐ 830 Patent | ☐ 810 Selective Service |
| ☐ 152 Recovery of Defaulted | ☐ 340 Marine | **PERSONAL PROPERTY** | Safety/Health | ☐ 840 Trademark | ☐ 850 Securities/Commodities/ |
| Student Loans (Excl | ☐ 345 Marine Product | ☐ 370 Other Fraud | ☐ 690 Other | | Exchange |
| Veterans) | Liability | ☐ 371 Truth in Lending | | **SOCIAL SECURITY** | ☐ 875 Customer Challenge |
| ☐ 153 Recovery of Overpayment | ☐ 350 Motor Vehicle | ☐ 380 Other Personal | **LABOR** | | 12 USC 3410 |
| of Veteran's Benefits | ☐ 355 Motor Vehicle | Property Damage | | ☐ 861 HIA (1395ff) | ☐ 891 Agricultural Acts |
| ☐ 160 Stockholders Suits | Product Liability | ☐ 385 Property Damage | ☐ 710 Fair Labor Standards Act | ☐ 862 Black Lung (923) | ☐ 892 Economic Stabilization |
| ☐ 190 Other Contract | ☐ 360 Other Personal Injury | Product Liability | ☐ 720 Labor/Mgmt Relations | ☐ 863 DIWC/DIWW (405(g)) | Act |
| ☐ 195 Contract Product Liability | | | ☐ 730 Labor/Mgmt Reporting & | ☐ 864 SSID Title XVI | ☐ 893 Environmental Matters |
| ☐ 196 Franchise | | | Disclosure Act | ☐ 865 RSI (405(g)) | ☐ 894 Energy Allocation Act |
| | | | ☐ 740 Railway Labor Act | | ☐ 895 Freedom of Information |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 790 Other Labor Litigation | **FEDERAL TAX SUITS** | Act |
| | | | ☐ 791 Empl.Ret. Inc. Security | | ☐ 900 Appeal of Fee |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motion to Vacate | Act | ☐ 870 Taxes (US Plaintiff or | Determination Under |
| ☐ 220 Foreclosure | ☐ 442 Employment | Sentence Habeas Corpus: | | Defendant | Equal Access to Justice |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing | ☐ 530 General | | ☐ 871 IRS - Third Party | ☐ 950 Constitutionality of State |
| ☐ 240 Torts to Land | ☐ 444 Welfare | ☐ 535 Death Penalty | | 26 USC 7609 | Statutes |
| ☐ 245 Tort Product Liability | ☐ 440 Other Civil Rights | ☐ 540 Mandamus & Other | | | ☐ 890 Other Statutory Actions |
| ☐ 290 All Other Real Property | ☐ 445 Amer w/ disab - Empl | ☐ 550 Civil Rights | | | |
| | ☐ 446 Amer w/ disab - Other | ☐ 555 Prison Condition | | | |
| | ☐ 480 Consumer Credit | | | | |
| | ☐ 490 Cable/Satellite TV | | | | |

## VI. CAUSE OF ACTION (CITE THE US CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE BRIEF STATEMENT OF CAUSE. DO NOT CITE JURISDICTIONAL STATUTES UNLESS DIVERSITY)

28 U.S.C.A. Sec. 1332

## VII. REQUESTED IN COMPLAINT: ☐ CHECK IF THIS IS A CLASS ACTION    DEMAND $_____  ☐ CHECK YES only if demanded in complaint:
UNDER F.R.C.P. 23                                JURY DEMAND: ☑ YES ☐ NO

## VIII. RELATED CASE(S)
IF ANY

PLEASE REFER TO CIVIL L.R. 3-12 CONCERNING REQUIREMENT TO FILE
"NOTICE OF RELATED CASE".  MDL No. 1699, Judge Breyer

## IX. DIVISIONAL ASSIGNMENT (CIVIL L.R. 3-2)
(PLACE AND "X" IN ONE BOX ONLY)    ☑ SAN FRANCISCO/OAKLAND    ☐ SAN JOSE

DATE

2/13/2008

SIGNATURE OF ATTORNEY OF RECORD



JS 44 Page 2
(Rev. 11/04)

### INSTRUCTIONS FOR ATTORNEYS COMPLETING CIVIL COVER SHEET FORM JS-44
### Authority For Civil Cover Sheet

The JS-44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleading or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. The attorney filing a case should complete the form as follows:

I.    (a) Plaintiffs - Defendants. Enter names (last, first, middle initial) of plaintiff and defendant. If the plaintiff or defendant is a government agency, use only the full name or standard abbreviations. If the plaintiff or defendant is an official within a government agency, identify first the agency and then the official, giving both name and title.

(b) County of Residence. For each civil case filed, except U.S. plaintiff cases, enter the name of the county where the first listed plaintiff resides at the time of filing. In U.S. plaintiff cases, enter the name of the county in which the first listed defendant resides at the time of filing. (NOTE: In land condemnation cases, the county of residence of the "defendant" is the location of the tract of land involved.)

(c) Attorneys. Enter the firm name, address, telephone number, and attorney of record. If there are several attorneys, list them on an attachment, noting in this section "(see attachment)".

II.    Jurisdiction. The basis of jurisdiction is set forth under Rule 8(a). F.R.C.P., which requires that jurisdictions be shown in pleadings. Place an "X" in one of the boxes. If there is more than one basis of jurisdiction, precedence is given in the order shown below.

United States plaintiff. (1) Jurisdiction based on 28 U.S.C. 1345 and 1348. Suits by agencies and officers of the United States are included here.

United States defendant. (2) When the plaintiff is suing the United States, its officers or agencies, place an "X" in this box.

Federal question. (3) This refers to suits under 28 U.S.C. 1331, where jurisdiction arises under the Constitution of the United States, an amendment to the Constitution, an act of Congress or a treaty of the United States. In cases where the U.S. is a party, the U.S. plaintiff or defendant code takes precedence, and box 1 or 2 should be marked.

Diversity of citizenship. (4) This refers to suits under 28 U.S.C. 1332, where parties are citizens of different states. When Box 4 is checked, the citizenship of the different parties must be checked. (See Section III below; federal question actions take precedence over diversity cases.)

III.   Residence (citizenship) of Principal Parties. This section of the JS-44 is to be completed if diversity of citizenship was indicated above. Mark this section for each principal party.

IV.   Origin. Place an "X" in one of the seven boxes.

Original Proceedings. (1) Cases which originate in the United States district courts.

Removed from State Court. (2) Proceedings initiated in state courts may be removed to the district courts under Title 28 U.S.C., Section 1441. When the petition for removal is granted, check this box.

Remanded from Appellate Court. (3) Check this box for cases remanded to the district court for further action. Use the date of remand as the filing date.

Reinstated or Reopened. (4) Check this box for cases reinstated or reopened in the district court. Use the reopening date as the filing date.

Transferred from Another District. (5) For cases transferred under Title 28 U.S.C. Section 1404(a). Do not use this for within district transfers or multidistrict litigation transfers.

Multidistrict Litigation. (6) Check this box when a multidistrict case is transferred into the district under authority of Title 28 U.S.C. Section 1407. When this box is checked, do not check (5) above.

Appeal to District Judge from Magistrate Judgment. (7) Check this box for an appeal from a magistrate judge's decision.

V.    Nature of Suit. Place an "X" in the appropriate box. If the nature of suit cannot be determined, be sure the cause of action, in Section IV above, is sufficient to enable the deputy clerk or the statistical clerks in the Administrative Office to determine the nature of suit. If the cause fits more than one nature of suit, select the most definitive.

VI.   Cause of Action. Report the civil statute directly related to the cause of action and give a brief description of the cause.

VII.  Requested in Complaint. Class Action. Place an "X" in this box if you are filing a class action under Rule 23, F.R.Cv.P.

Demand. In this space enter the dollar amount (in thousands of dollars) being demanded or indicate other demand such as a preliminary injunction.

Jury Demand. Check the appropriate box to indicate whether or not a jury is being demanded.

VIII. Related Cases. This section of the JS-44 is used to reference related pending cases if any. If there are related pending cases, insert the docket numbers and the corresponding judge names for such cases. Date and Attorney Signature.

Date and Attorney Signature. Date and sign the civil cover sheet.